

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00416-CV

IN THE INTEREST OF
J.T.V.H., MINOR CHILD

-----------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

-----------

## MEMORANDUM OPINION[1]

-----------

## I. Introduction

In two issues, Appellant Mother appeals the termination of her parental rights to J.T.V.H. We affirm.

## II. Factual and Procedural Background

Mother and J.T.V.H. tested positive for methamphetamine, and Child Protective Services (CPS), through the Department of Family and Protective Services (DFPS), removed J.T.V.H. from Mother and created a service plan for

---

[1]*See* Tex. R. App. P. 47.4.

her, which the court ordered her to complete. Mother remained drug-free for a year and, after receiving an extension of time, she completed most of her service plan requirements, but by the time of the trial, she had not established or maintained stable housing or employment, and she had not consistently paid child support. In a vote of 10–2, the jury found that Mother had endangered J.T.V.H., that she had failed to comply with the requirements specifically establishing actions necessary for his return to her, and that it was in J.T.V.H.'s best interest that her parental rights be terminated.[2] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (2) (West Supp. 2010). The trial court terminated Mother's parental rights on the grounds found by the majority of the jury, and this appeal followed.

### III. Legal Sufficiency

In her second issue, Mother argues that the evidence is legally insufficient to support the best interest finding.[3]

### A. Standard of Review

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief

---

[2]The trial court also terminated Father's parental rights to J.T.V.H., but Father does not appeal.

[3]Mother also sets out a factual sufficiency standard of review, but her argument—and the only relief she seeks—is based on legal sufficiency.

2

or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the results of a psychological evaluation of the child's parent; whether there is a history of abusive or assaultive conduct by the child's family; whether there is a history of substance abuse by the child's family; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with a safe physical home environment and protection from repeated exposure to violence even though the violence may not be directed at the child; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)     the desires of the child;

4

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Evidence

In addition to testimony by Mother and her stepmother J.V.H., the other witnesses at trial were J.T.V.H.'s Court Appointed Special Advocate (CASA)

5

worker Diane Reynolds and her supervisor, Cheri Fry; Vanette Meachem, Mother's START case manager during most of Mother's stay at the Salvation Army, and Katrice Goodman, Mother's interim case manager after Meachem; Dr. Catherine Bass, who performed Mother's psychological evaluation; CPS caseworker Candice Williams; S.T., J.T.V.H.'s foster mother; Mother's counselor, Deborah Boyles; Mother's friends Sarah Brauderick and Geena McKinney; and Mother's Narcotics Anonymous (NA) sponsor Connie Stockton. The trial court also admitted into evidence Mother's Mental Health Mental Retardation (MHMR), Salvation Army, counseling, and psychological evaluation records.

**1. J.T.V.H.**

J.T.V.H. was born after Mother had a one-night stand with Father.[4] In May 2009, when J.T.V.H. was two, CPS removed him from Mother. Reynolds described J.T.V.H. as "[a] sweet little boy" who, when she met him in July 2009, played by himself on the floor. She stated that this concerned her because children often run around and play at his age.

In August 2009, CPS placed J.T.V.H. with S.T.—Father's ex-wife with whom he has a six-year-old daughter, J.T.V.H.'s half-sister—and J.T.V.H. remained with S.T., her husband B.T., and his half-sister during the pendency of the case.[5] Like Reynolds, S.T. noted that J.T.V.H. was very quiet and did not

---

[4]Father was absent throughout the case.

[5]Father and S.T. divorced in 2006 after she caught him cheating on her.

interact much at first, but she said that within three weeks, J.T.V.H. had become comfortable with a routine and started talking and playing. J.T.V.H. and his half-sister have a typical sibling relationship, and Reynolds stated that he has become "[a] very active and rambunctious three-year old."

J.T.V.H. was developmentally delayed in his speech at the beginning of the case, "doing more mumbling, grunting, and not communicating verbally." At CASA and CPS's recommendation, Early Childhood Intervention (ECI) evaluated J.T.V.H. and began providing speech therapy for him. ECI indicated to S.T. that at the age J.T.V.H. came to her, he should have had twenty-five words in his vocabulary, but "[h]e didn't have any words to say."

Mother said that she did not think J.T.V.H. had any problems, that he was fine, and that she "never had any issues with him." Mother also said that she did not think J.T.V.H.'s delayed speech was related to her drug use because she smoked drugs in the bathroom with the door shut when he was home. Mother would send J.T.V.H. to stay with her parents on the weekends and would pick him up on Monday while still high.

### 2. J.T.V.H.'s Caregivers

#### (a) Mother

Sarah Brauderick, who Mother met in college and who knew Mother's stepmother (J.V.H.), her biological mother (V.K.), and her father (M.V.H.), had been Mother's roommate in The Colony. She moved out and then called CPS about Mother's drug use. Although Mother was very angry at being reported to

CPS, they became friends again three or four months after Mother finished rehab. Brauderick indicated that Mother took her CPS service plan seriously.

At the time CPS removed J.T.V.H. via writ of attachment, Mother and J.T.V.H. had been living with Geneva, an active methamphetamine user, and Geneva's daughter; Mother and Geneva used methamphetamine together. Mother said that her father and stepmother never suspected that she was on drugs "until the whole CPS stuff happened."

During her July 2009 sessions with her first counselor, Gayle Spagnola, Mother blamed her hometown, The Colony, for the drugs' availability and the number of drug users who made the drugs available to her. Mother said that she did not like Spagnola because she always felt worse about herself after an appointment than before, and she felt that Spagnola judged her. Reynolds said that Mother went to her last appointment with Spagnola "high and . . . just out of control[,] . . . using profane language," and Spagnola told Mother to get herself together and take counseling more seriously before she returned. Mother did not return to counseling with Spagnola.

Mother began shooting methamphetamine instead of just smoking it when CPS removed J.T.V.H. from her, and she started using it two to three times per day. Mother did not start any of the services on her service plan on time, and she missed some visits with J.T.V.H. before she entered inpatient drug rehabilitation because she was "real messed up." She also missed her first psychological evaluation—scheduled prior to rehab—because of her drug use.

8

Upon her medical discharge for influenza, Mother relapsed into drug use when she went back to The Colony,[6] but she eventually completed rehab.

A November 2009 MHMR report indicated that Mother blamed the rehab facility for her relapse because of the medical discharge; the same report also revealed that Mother had attempted suicide while in high school and had a childhood history of physical and sexual abuse. A January 2010 MHMR report recited that Mother had been sexually abused by an uncle during childhood, that her father M.V.H. had physically abused Mother and her brother, and that M.V.H.'s abuse of Mother continued from childhood through the recent past. Mother reported this abuse during her psychological evaluation with Dr. Bass in February 2010 and again to Boyles, her second counselor. Mother did not report the sexual abuse when she was a child because she did not want to "break the family up" and because she was afraid that M.V.H. would kill her uncle.

In her psychological evaluation, in addition to her father's physical abuse of her and her brother, Mother revealed that her biological mother, V.K., left home when Mother was one or two years old, and Mother was raised primarily by M.V.H. and J.V.H. Mother started smoking marijuana in high school, which she said helped her to stop cutting on her legs and arms. She was hospitalized at age seventeen after a drug overdose put her into a coma for three days, and she

---

[6]Several attempts were made to locate Mother during her month-long relapse, but no one was able to find her, and she did not check on J.T.V.H. during that time.

9

started using methamphetamine two years later. As an adult, she smoked marijuana with V.K., and in 2009, she was arrested for assault after an altercation with V.K..

Dr. Bass testified that all of these incidents concerned her, as well as the physical abuse by M.V.H. when Mother and her brother were children, and the sexual abuse of Mother by her uncle. Dr. Bass also said that she was concerned that Mother still had no job and no transportation and that stress and lack of stability might cause Mother to relapse. Further, because of the type of drugs Mother had used and Mother's issues, Dr. Bass felt that Mother would need counseling and the help of multiple professionals in order to stay drug free. Dr. Bass said she would not recommend that J.T.V.H. be returned to Mother "until there's more stabilization." Dr. Bass observed that a parent's goal of staying sober did not trump a child's right to have stability, security, safety, and good parenting by that parent and that staying off drugs was a minimum necessity, but not sufficient by itself, for taking care of and raising a child.

Mother testified that her drug use had been a "coping mechanism" to help with her depression and bipolar condition; after entering rehab, Mother began taking lithium and other medications to treat these conditions. A November 2009 MHMR report indicated that Mother needed more time to stabilize on her medication, that she had a set date to enter the Salvation Army program (although she had not completed her relapse prevention assignments or found a

10

temporary sponsor), and that she had not talked to her CPS worker, even though the CPS worker had called to talk with her.

Mother successfully completed rehab in December 2009. Her discharge summary lists all of the services Mother received while in rehab but included a notation that although Mother completed all of her work assignments, it was clear that her only purpose for treatment was to comply with CPS's requirements and that she did not try to or seem interested in obtaining a sponsor while in treatment.

After rehab, Mother moved into the Salvation Army, where she tested negative for drugs in over eighty random drug tests and completed a number of programs, including a seven-week job skills workshop that included resume-writing, interviewing, and job search skills. The Salvation Army provided Mother with case management, shelter, job referrals, and meals.

Boyles began counseling Mother in February 2010 and stated in one of her reports that Mother seemed motivated and determined to meet her goals so that she could raise J.T.V.H. independently. Boyles said that Mother's number one issue over the last sixteen months was to get her son back and to stay clean; that she thought Mother had done some of the recommendations from her psychological evaluation, which included supervised contact with J.T.V.H., participation in therapeutic services, and development of better coping and decision-making skills; and that Mother continued to work on these tasks. Boyles said that she thought Mother was intimidated by authority figures, not lazy.

11

Mother started attending Community Addiction Treatment Services (CATS) in March 2010; she completed CATS and a six-to-seven month outpatient rehab program through MHMR but could not explain why it took her three months after completing inpatient rehab to start attending CATS. Mother also successfully completed her parenting classes in March 2010, but at trial, she could not say what developmental milestones were appropriate for a three-and-a-half-year-old child. Dr. Bass noted that Mother was intelligent, and she agreed that Mother should be able to indicate what she learned from her parenting classes. Dr. Bass added that she would wonder why Mother could not and might infer that Mother had attended the classes but did not take them "to heart enough to maintain" and use the information when it became applicable.

Mother's Salvation Army records include some written disciplinary actions for various rule violations. Salvation Army rules included not leaving the facility without a weekend pass and not retaining possession of prescribed medications. In March, Mother received a written disciplinary action report for a curfew violation. Her handwritten response on the report was: "I didn't intentionally disobey. I just misunderstood instructions and I am sorry."

In April, Mother received three more disciplinary action reports for unauthorized use of facility door access code, refusal to turn her medications over to Salvation Army staff, and exposing her stomach on the playground. Mother's handwritten response on the facility door report was: "Someone had to use restroom. . . . I knew code so punched it but was never told not to—but I am

sorry and know better now." At trial, Mother explained that it was an elderly lady who "was almost like going to pee in her pants" and that her instinct told her to unlock the door to help. Mother did not write a response to the report involving her medications, but at trial she acknowledged that she had kept her medications longer than she was supposed to instead of immediately turning them over to Salvation Army staff.

Mother's handwritten response to the playground report and her explanation at trial was that she was with other women who were tanning and exposing their stomachs; one of the women got in trouble for it and implicated everyone else. Meachem stated that the playground area was not an appropriate location to tan or pull one's shirt up because of the homeless men walking around nearby.

Mother also got in trouble once for failing to double-check with a case aide that her room was clean enough before leaving on a weekend pass. Mother acknowledged that she and her roommates were very bad at keeping their shared room clean. She said that the staff probably noted every week that she and her roommates were not living in a clean room, and she admitted that it might be a problem taking care of a small child if she could not keep her own room clean.

Meachem stated that Salvation Army residents are not supposed to drink alcohol on a weekend pass, but Mother admitted that she went out on New Year's Eve, drank alcohol, and became intoxicated that night and that on around

three weekend passes, she engaged in drinking activities with friends and became "a little buzzed off a couple of beers." And Mother admitted that she did not always follow the rule requiring her to sign out and sign back in every time she left the Salvation Army facility, stating, "I broke, you know, a little rule here and there, and I'm sorry."

In June 2010, Mother's MHMR counselor reported that Mother's lithium dosage had been changed, making her less manic and calmer, that Mother was able to see J.T.V.H. once a week for two hours, that Mother was working three days a week and was trying to find a full time job, that Mother was attending NA daily and had a sponsor, and that Mother had eight more CATS group sessions and one more individual session to complete. Three days later, Mother obtained a MHMR caseworker, and a Salvation Army report noted that Mother hoped to obtain housing via MHMR's sponsorship.

On August 6, 2010, Fry contacted Meachem to find out where Mother went when she left the Salvation Army on the weekends. The Salvation Army records reflect that Mother filed weekend pass requests on the following dates:

- January 21, 2010 (Chris in Alvarado, approved);

- February 3, 2010 (Chris in Alvarado, approved);

- February 11, 2010 (Chris in Alvarado, approved);

- March 4, 2010 (Suni's family in Cleburne, approved);

- March 15, 2010 (V.K. in Terrell, not submitted);

14

- March 18, 2010 (Sponsor in Fort Worth, denied with notation, "No Overnight until Room is Clean!");

- March 31, 2010 (M.V.H. and J.V.H., denied with notation "You are still on restriction from weekend pass—you can request a DAY PASS!");

- April 8, 2010 (Sponsor Angela in Fort Worth, approved);

- April 22, 2010 (incomplete form to visit friends in Fort Worth, approved);

- April 29, 2010 (Brandy in Fort Worth, denied for "continued behavior issues— uncleanliness of room");

- May 7, 2010 (V.K. in Terrell, denied as turned in too late);

- May 10, 2010 (V.K. in Terrell, approved);

- May 18, 2010 (Sponsor Connie on road-trip to NA convention, approved);

- June 10, 2010 (Brauderick in Plano, filled out but did not seek approval);

- June 17, 2010 (Brandy in Fort Worth, only extended hours approved);

- June 24, 2010 (Brandy in Fort Worth, approved);

- July 7, 2010 (Tiffany in The Colony, approved);

- July 22, 2010 (Geena and Mark McKinney in Dallas, approved);

- July 29, 2010 (Brauderick in Dallas, approved);

- August 5, 2010 (Dede in Fort Worth, denied);

- August 12, 2010 (Brandy in Fort Worth, partial approval for extended hours);

- August 16, 2010 (Rebecca in Carrolton, approved);

- August 20, 2010 (Rebecca in Carrollton, approved);

- September 1, 2010 (Brandy in Fort Worth, approved);

- September 9, 2010 (Emma in Bedford, approved); and

15

- September 23, 2010 (Brandy in Fort Worth, approved).

Mother said that she occasionally had other people sign in for her in her NA group but claimed that she always went to the meetings. She explained the discrepancy between a sign-in sheet for the NA meeting dated the same day as a weekend pass that indicated that she was actually in Alvarado at the time of the meeting by stating, "a zillion times . . . I filled out a pass and . . . never left the Salvation Army." She also stated that although V.K. currently uses drugs, V.K. did not use drugs on the weekends that Mother stayed with her. Mother met some of the people she visited on weekend passes in rehab, in CATS, at the Salvation Army, or at NA. Fry said that after reviewing Mother's Salvation Army records, she was concerned about "every weekend, she went to someone—I can't say every weekend she went to someone different, but there was no consistent someone that she was going to and that seemed random."

Meachem, who met with Mother around once a month from December 2009 until August 2010, testified that in her opinion, Mother was not capable of making decisions for herself and her child because Mother was immature. Meachem saw Mother make only minimal effort in her participation in Salvation Army programs but, as far as she knew, Mother never had any problem finding transportation to use her weekend passes or to go anywhere she wanted to go, even though she occasionally had difficulty getting to her services, particularly visitations and court hearings. Meachem said that she was surprised that Mother still had not secured housing, a job, or a plan for her future with J.T.V.H.

16

"[b]ecause the tools were there for her to—to use. I just don't think she really put forth that extra effort to make it really happen." Meachem told Fry that she did not feel that Mother was ready to be a mother due to her lack of maturity and responsibility.

With regard to Mother's bond with J.T.V.H., J.V.H. said that when J.T.V.H. and Mother were together, J.T.V.H. "was always just . . . . talking to her and touching her and hugging her and sitting on her lap," and that it was awful when Mother would have to leave her visits with him. In contrast, Reynolds stated, "It is apparent [J.T.V.H.] loves his mom, but there was not a mother/child bond" based on what she had observed of their visits. Reynolds, who admitted on cross-examination that she did not have any psychological training and based her opinion on her own parenting experience, elaborated by saying that when the visits began, Mother "would normally just sit in the chair and [J.T.V.H.] would play by himself on the floor,"[7] with little interaction between them. After completing her parenting classes, Mother started sitting on the floor and trying to interact with J.T.V.H. Williams, Mother's CPS caseworker, admitted that she had no reason to believe that Mother was not bonded with J.T.V.H.

---

[7]Reynolds was not at a visit when Mother brought J.T.V.H. toys and played with him on the floor or for Mother's Easter visit, when Mother brought J.T.V.H. an Easter basket. She was not at the visit when Mother and her father brought J.T.V.H. a birthday cake and toys for his birthday. And she was not at the visits at McDonald's, where Mother played on the slide with J.T.V.H. and they ate ice cream together.

Mother said that Reynolds was the person with whom she spoke the most, that she did not talk with Williams, and that she was afraid of Fry.[8] Mother never asked anyone about how to get more time to visit with J.T.V.H., explaining that she felt that Reynolds and Williams were completely against her.

In her relapse prevention plan, Mother identified the following as her high risk situations: parties, watching sports, celebrating, having a "long day," and suffering the loss of a loved one; she identified feeling overwhelmed, depressed, anxious, or wanting to celebrate as causing her urges to use drugs; and she identified the following as social pressure to use drugs: going out to dinner or a BBQ, being around old friends, being at the lake with friends, and going to a club. Her plan to manage these situations and urges were to not go to a party unless she could say "no," to watch events with sober friends, to stay productive and concentrate on positive and logical thinking, to exercise and stay busy, to stay away from users, to focus on the "big picture," to substitute dancing in lieu of drinking at clubs, and to "let go and let God." She listed that she would use her leisure time for: (1) exercise, (2) going to the library/museum/animal shelters, (3) being with her son and being "mama again," (4) going to church, and (5) going to NA meetings. With regard to her subsequent relapse prevention plan, Mother

---

[8]Fry testified that she had interacted with Mother on many occasions, had never received an indication that Mother was afraid of her, and was surprised to hear that Mother was afraid of her.

intended to "stay in close contact with [her] sponsor and work on the [twelve] steps."

Major Elizabeth Anderson provided a letter of recommendation for Mother, stating that Mother had "participated in process and discussion groups and ha[d] shown growth" and that she was very pleased with the growth she saw in Mother, who was "working hard to make changes and really wants to do better so she can start a new life with her son!" Meachem testified that Anderson was the new major at the Salvation Army and that Anderson started after Meachem left.

When asked why it was best for J.T.V.H. to return to her, Mother told Fry, "Because I'm his mother," with no other reason. Mother told the jury that above anything else, they should consider that the most important thing she had learned during the CPS process was to be sober. She admitted that she had no job, no home of her own, no car, and no money. Mother explained that she loved her son before adding that she went to NA meetings "for [her] son and . . . for [her]self," stating, "if I'm not here, then how am I going to do anything for him? I mean above all we go for ourselves, but of course he was second."

### (b) Mother's Family

By the time of the trial, Mother had moved back in with her father M.V.H. in The Colony and planned to move to Iowa to live with her stepmother J.V.H. Other than J.T.V.H., Mother's family is composed of M.V.H., J.V.H., and her biological mother V.K. J.V.H. married M.V.H. in 1990 and divorced him in 2007, but they only stayed apart for four months, and J.V.H. said that she still

19

considered them married.  M.V.H. has been retired since 2006 or 2007, the same year that they broke up and he left J.V.H. with a significant amount of the household credit card debt.  She said M.V.H. suffered from depression at the time and was not at their divorce hearing because he could not be located.  He returned in time for her birthday in March 2007.

**(1) Abuse**

V.K. told S.T. that the reason she left M.V.H. was because he was abusive, and Mother said she had told her MHMR case manager that M.V.H. had abused her and her brother when they were children.  Mother said that this was why M.V.H. and J.V.H. were initially denied a home study for J.T.V.H.'s placement.

J.V.H. said that M.V.H. now treated Mother as an adult, but she admitted that M.V.H. spanked Mother when she was younger and that when Mother was a teenager, Mother thought this was abusive.  J.V.H. said that M.V.H. never hurt Mother or her brother physically and that she never saw him beat, hurt, or abuse his children.  McKinney, who had known Mother since high school, said that she saw M.V.H. unnecessarily discipline Mother but that he never was abusive, just stricter than Mother liked.

J.V.H. agreed that if Mother had reported that M.V.H. had abused her and her brother, Mother would have been lying.  However, when asked about her biological son's comments about M.V.H., J.V.H. testified as follows:

Q. Would it surprise you that after giving him as a reference on the home study, he could not recommend [M.V.H.] but could recommend you?

A. No, it wouldn't surprise me.

Q. Would it surprise you that he accused [M.V.H.] of abusing him?

A. No, it wouldn't surprise me.

Q. And that he felt you turned a blind eye to it and didn't stick up [for] him?

A. That he would say that, no, it doesn't surprise me.

Q. Is he prone to lying?

A. No.

J.V.H. explained that her son had wanted to stay with his father and did not want to be disciplined by another man.

Mother claimed that her relationship with M.V.H. had been better since J.T.V.H. was born, that M.V.H. was completely different with his grandchild, and that she had talked with him about disciplining J.T.V.H. She said that she did not recall telling DFPS in April 2009 that there was no way she could live with her father if she did not have some sort of drug to help her get by, but Reynolds said that Mother told her many times that she would not go back to The Colony to live with M.V.H. because it would not be a good place for her.

Brauderick said she had never seen M.V.H. be pushy or violent with Mother or J.V.H. S.T., who was out in the hallway when J.V.H. finished testifying, overheard J.V.H. say to Brauderick, "Don't be nervous, honey, I have a lot more to hide than you do."

21

### (2) Home Study

When asked how many times M.V.H. referred to her as a "bitch" during the home study, J.V.H. said "Well, I have no idea." She said that he did not say it "in derogatory terms" and "wasn't being derogatory" to her but admitted that it probably was not appropriate for him to do while their house was being evaluated for placement suitability. J.V.H. also recalled M.V.H. telling the caseworker that marijuana is a completely different drug now than when he was a kid, which she agreed was inappropriate. She did not recall M.V.H. telling the caseworker that he had only fought men who were bigger than him and that he had never lost a fight but said, "That sounds like something he would say."

When asked whether she would agree with the statement her brother gave CPS for the home study, that M.V.H. was lazy, antiauthoritarian, and unstable, J.V.H. replied, "Well, he's antiauthoritarian, I would say, but he's not lazy." At a June 2010 meeting, Mother told Boyles that she thought M.V.H.'s stability was due to J.V.H. but that J.V.H. might take a job out-of-state and M.V.H. had to decide whether he would join her. Fry testified that when she asked J.V.H. a week before trial if M.V.H. would be moving to Iowa, J.V.H. said, "No," that he did not like Iowa, and that "it was far too cold for him."

In July 2010, Mother told Boyles that she had to calm M.V.H. when he became very upset about J.T.V.H.'s birthday party being changed due to a miscommunication. M.V.H. did not testify at trial; J.V.H. said that M.V.H. did not

22

pursue visits with J.T.V.H. "[b]ecause it tore him apart to see [J.T.V.H.] and not be able to take him with him."

### (3) Drug Use

When asked about Mother's methamphetamine use, J.V.H. said she had been unaware of it because she had never been around drugs, stating, "I just thought she was acting strange." J.V.H. admitted that she had been very naïve but said that now that she knew how to recognize drug-use, she would not stand by and let Mother use them or expose J.T.V.H. to them. J.V.H. acknowledged that she had not taken any classes offered for family members of substance abusers, even though she knew that such classes and resources were available, that she had never been around any drug users besides Mother in the last year, and that she had only seen Mother four or five times in the last year and a half.

J.V.H. acknowledged that in May 2009, she knew CPS was investigating Mother. J.T.V.H. was in J.V.H.'s home on May 22, the day he was taken by CPS for his drug test. When CPS returned him, J.V.H. let Mother take him to V.K.'s house without calling the police or CPS and without making any effort to stop Mother. She said that she let Mother take him because although Mother was being investigated, there was no proof at that time. She admitted that she did not know if Mother had been high when she picked J.T.V.H. up and that in retrospect, it was a bad decision. J.V.H. elaborated:

> [Mother] is a wonderful mother, and she was making—she made some mistakes. If I thought [J.T.V.H.] was in danger at the time, if I

23

truly thought he was in danger at that particular moment, I wouldn't have let her.

I'm trying to think if I was even there at the time, I'm not sure. I might have been at work. I'm not sure.

Mother testified that V.K. smoked "pot" occasionally and that she was sure her mother was a drug addict. S.T. stated that V.K. had gone to jail for a couple of years "for drugs" when S.T. was five years' old.

With regard to M.V.H., J.V.H. said that he did not use drugs and that although he drank beer, she had never seen him drunk. She admitted that M.V.H. had told her that he used drugs when he was younger and that he was not into "big government," but she did not recall telling DFPS that her husband was a "stick-it-to-the-man kind of guy." Fry stated that both M.V.H. and J.V.H. took drug tests for the home study and both were clean.

### (4) Other

Fry talked about M.V.H. with J.V.H. a week before trial and testified that J.V.H. said, "[Y]ou're young and you're female and you don't have the life experience that you need. When you talk to him, he's going to be defensive, so keep that in mind." Fry repeated, "Her words were, I just want you to be aware," to which Fry said, "okay." At that time, Fry did not feel like it was a safe environment for her to try to enter.

J.V.H.'s version of their conversation was that she told Fry, "[W]hen you talk to [M.V.H.], understand that you're young, and you haven't raised children, and he's had a lot more experience, and he raised his kids by himself before I

came along." She added, "He wouldn't take real well to somebody just barging in the house and criticizing his child-rearing skills." She also gave the following testimony about this issue:

Q. Okay. To be aware that she's young, he wouldn't like that; she's female, he won't like that. Why is that? Why won't he like that?

A. I explained to her that she's going to try and tell him he's done something wrong, and he's older than she is, and he raised his kids alone for five years, he does have some definite ideas. And for a young person to start telling an older person how to do things, yeah, that might offend him.

Q. Okay. How old is [Mother]?

A. 28.

Q. Okay. And what's going to happen if she starts telling [M.V.H.] what to do with [J.T.V.H.] if this jury returns him?

A. I don't know that she's—I don't know that she'll—I can't even visualize that.

Q. Who will be taking care of [J.T.V.H.]? [Mother] or [M.V.H.]?

A. While she's at work, [M.V.H.].

Q. And you don't anticipate any problems between how to raise a three-year old between [M.V.H.] and [Mother]?

A. No. There wasn't before when we watched him.

Q. Okay. There's no likelihood that that would come up?

A. I don't think so.

Q. Okay.

A. I can't guarantee that. I can't see the future.

Q. Okay.

25

The trial court also admitted and allowed publication to the jury of Petitioner's Exhibits 10, 11, and 12, which showed that M.V.H. received fifteen months' community supervision for charges of fleeing a police officer and resisting arrest[9] and a $300 fine for a misdemeanor assault charge.[10]

J.V.H. admitted that she told CPS that she would not release Mother's phone number because to do so would violate Mother's trust and if she violated Mother's trust, then Mother would not communicate with her. J.V.H. said that she did not refuse to give the number to help Mother avoid CPS and that she realized the case was about J.T.V.H., not Mother.

J.V.H. did not know what NA group Mother was currently attending or when; she knew of Mother's sponsor but did not know her. She assumed that the Salvation Army had required Mother to attend NA when she lived there and said that Mother now was requiring herself to go. J.V.H. kept alcohol in the house for guests but did not know that alcohol could be a relapse trigger.

### (c) J.T.V.H.'s Foster Family

Twenty-seven-year-old S.T. and her thirty-four-year-old husband B.T. celebrated their two-year anniversary during the week of trial and have lived in

---

[9]J.V.H. explained that on November 15, 1997, M.V.H.'s son was late for a school wrestling tournament and the school bus had already left, so M.V.H. sped to catch up with the bus.

[10]J.V.H. explained that on October 11, 2000, M.V.H. drove up, heard Mother's boyfriend curse at J.V.H. and saw him push her, lost his temper, and hit the boyfriend.

26

their home for a little over two years.  S.T. is a hairstylist and a student at Texas A&M Commerce, studying early childhood education, and B.T. is a Dallas police officer.  S.T. said that she had been a hair stylist for five-and-a-half years, that her daughter was almost two when she divorced Father, and that she managed to pay for her own house and work while a single mother.  S.T. works twenty to thirty hours per week and is enrolled in eighteen credit hours.  B.T. works from 7 a.m to 3 p.m., Monday through Friday.  S.T. testified that they were prepared to adopt J.T.V.H., that she loves him, and that she and her husband are bonded with him.

Mother's mother V.K. had been a friend of S.T.'s family throughout S.T.'s life.  S.T. became involved in the case when V.K. called her and told her that CPS has taken J.T.V.H., and S.T. volunteered to take him.  Over the last year, S.T. and B.T. have taken J.T.V.H. and his half-sister to birthday parties and get-togethers at V.K.'s house.  S.T. has let J.T.V.H. spend the night at V.K.'s house a few times and has let her daughter spend the night there once.  She did not ask CPS for permission but said that she did not remember whether CPS had told her she was supposed to obtain CPS approval before allowing J.T.V.H. to stay overnight at someone's home.  S.T. said that she did not know V.K. was still using drugs and that V.K. told her that CPS would not place J.T.V.H. with her because of V.K.'s criminal record.  S.T. said that J.T.V.H. brought home toys, but not clothing, from visits with Mother and that he never appeared to be traumatized or to suffer from separation anxiety after a visit.  In the fifteen months

27

before trial, Mother called no more than five times to check on J.T.V.H. even though she knew how to contact S.T. and could do so at any time.[11] S.T. said that it would be best for J.T.V.H. to stay with her and her husband and that it would probably be detrimental to J.T.V.H.'s progress to leave her home and his routine.

Reynolds stated that J.T.V.H. functioned very well with S.T., B.T., and his half-sister, observing that he was "[h]appy, talking, laughing, running around. You could tell he was happy and loved." Fry stated that S.T. and B.T. were incredible parents in that they more than met his needs, loved him, and provided stability and a family for him. Mother said she could not imagine S.T. raising J.T.V.H., even though she understood CPS's concern about her history of drug use.

### 3. Mother's Housing

Mother participated in the Salvation Army's START program, a six-to-eight month program, but she wanted into the First Choice program, which provided similar services over eighteen months. Both programs help chemically dependent women beat their addiction problems and transition to housing and employment through job and housing search assistance, but in First Choice,

---

[11]Reynolds said that S.T. frequently invited Mother to call about J.T.V.H. but that Mother seldom did so; when she did call, it would be at unusual hours, like three a.m.

children can stay with their mothers and the Salvation Army provides day care while the mothers work their services.

To qualify for First Choice, the Salvation Army needed a commitment from CPS that J.T.V.H. would be placed with Mother or reunited with her within ninety days. Further, Mother would have to pass a physical, and Mother could not have a relationship with anyone currently in First Choice.

Fry said that although she had originally advocated for Mother to be placed in First Choice, Salvation Army personnel told her that this would not be possible because on a random room sweep, they found photos of Mother and another woman, who was already in First Choice with her child, that led them to conclude that Mother and the woman were in a romantic relationship. Fry also said that based on her contact with the Salvation Army, she learned that Mother did not seem to qualify as one of the highly motivated people who would be considered for First Choice, a competitive program with only thirteen beds. Fry learned from the Salvation Army that the First Choice spots were given to prime candidates who could make the most use of the program in beating addiction, transitioning to housing and employment, and becoming self-sustaining members of society. Mother had not been able to do that in the nine or ten months that she had already been at the Salvation Army.

Reynolds, who toured First Choice with Fry and First Choice's director, stated that based on her conversation with the director and the Salvation Army reports, she became concerned that Mother would not qualify, but she also said

that Mother lost the First Choice option because CASA and CPS did not agree to the reunification of Mother and J.T.V.H. Meachem and Goodman, Mother's interim Salvation Army case worker after Meachem left, agreed that Mother did not qualify for First Choice because she had not been reunited with her child.

Getting into First Choice appeared to be Mother's only plan for housing, and this worried Fry, particularly since, according to Boyles, as of April 2010, Mother knew that First Choice was not available to her. In May, Fry encouraged Mother to look elsewhere for stable housing and directed her to MHMR and its housing options, but in July, Mother and Boyles met with two Salvation Army administrators about First Choice. Mother was present at a July hearing when Fry testified that CASA did not feel Mother had made significant strides in her service plan in obtaining housing and long-term employment. In August, Meachem told Fry that Mother was not ready for the First Choice program.

Mother worked with someone at MHMR (Heidi) on housing, and Heidi told Fry in either August or September 2010 that she gave Mother the paperwork to fill out and was waiting on Mother to return it. In September, Mother told Boyles that she had spoken with her housing contact and felt that she would be able to have a place to live by November; Boyles noted that Mother was anxious to be able to show progress in housing and to have her son returned to her. As of October 6, 2010, Mother informed Goodman that she had completed her application for housing and turned it in.

Mother stayed in START for almost a year, and this alarmed Fry because "it was an emergency arrangement that was to provide a stepping stone for parents to get back on their feet. And she had been there longer than the time that they expected her to be there in order to get a job and find housing."

Williams said that CPS did not have the opportunity to see whether Mother had benefited from the services and to use what she learned in the raising and care of her child because while Mother was at the Salvation Army, she was provided with food and shelter, which other parents typically have to provide on their own. Further, Williams said that the Salvation Army was not a permanent solution for housing and that even if Mother had been admitted into First Choice, the program only lasted eighteen months, and this was not acceptable to DFPS because DFPS required permanence for the child. If something went wrong, DFPS did not want J.T.V.H. in a situation where he would be homeless. Lastly, Williams described her perception of the Salvation Army as "a pretty dangerous area," stating that at any given time, she had seen between twenty and forty transients outside and on the inside of the facility just inside the doors. START was housed in a separate section behind locked doors, and Brauderick said that she went to the Salvation Army to visit Mother over twenty times, that she never saw any unsavory characters hanging around there, and that it was a safe place "and an appropriate place for a child to be, if need be."

A week before the termination trial, Mother left the Salvation Army shelter to live with M.V.H., even though she had told her MHMR case manager that she

could not go back to her father's neighborhood and stay clean. Mother explained that she moved back in with M.V.H. because earlier in the case, CPS had told her that "there's no way Denton County is going to approve of a child coming to a shelter" for visits or to live with her there, and she recalled that at the preceding court appearance, DFPS's counsel had said, "You plan on bringing a child into a homeless shelter where there's pedophiles, drug addicts, and druggies coming in." From this, it appeared to her that he was not receptive to placing J.T.V.H. with her at the homeless shelter.

Mother said that she had been clean for a year by trial and that she and her family were talking about moving to Iowa, where J.V.H. had just moved. She said that, up until the week before trial, her plan for J.T.V.H. had been for him to move into the Salvation Army with her. Her new plan was to move to Iowa with her family as soon as the house in The Colony sold. Mother admitted that the house in The Colony had not been listed for sale yet and that J.V.H. had not yet purchased a house in Iowa.

J.V.H. said that she did not think the Salvation Army was the proper place to raise a small child and that if Mother's plan had been to raise him there, it was not a good plan. Fry said that the Salvation Army shelter is not an appropriate place to have a child because of the exposure to lots of risky behaviors.

Boyles admitted that, without M.V.H. and J.V.H., Mother was not prepared financially to take J.T.V.H. home and appropriately care for him or herself and that Mother did not have housing or day care set up for him.

32

### 4. Mother's Employment

Before her CPS case, most of Mother's work experience was her six-to-eight years of waitressing. But Mother did not want another waitressing job because most waitressing jobs involved nights, and the bus did not run past ten p.m. She applied for positions at a couple of restaurants that were open during the day as well as for positions with retail stores, an insurance company, and "various different places." Mother said that she understood why the court had ordered her to seek and maintain employment: "Because a single parent should have a job to support her kid."

Meachem described Mother's employment while she lived at the Salvation Army as "sporadic." Mother tried three different jobs: One lasted around four months and involved passing out fliers from door to door a few days a week for up to five hours per day. Another was a temporary job cleaning bathrooms. Mother left a waitressing job at the Fox & Hound on the last day of training because her trainer "was a chauvinist pig" and made her extremely nervous. She said she did not recall that Fox & Hound had offered her extra training, and she denied refusing the offer.

In July 2010, Fry visited Mother at the Salvation Army. It was around 10:30 a.m. but Mother was still asleep. Mother admitted that when Fry came to visit her that day, she was still in bed but could have been looking for a job. Fry said there was no reason for Mother to still be unemployed because she is very intelligent and physically healthy but lacks the motivation that someone who

really wanted her child back would have. Boyles agreed that Mother was smart, physically healthy, and capable of getting things done when she wanted to and said the only explanation she had for Mother's continued unemployment was "[j]ust that she's been having trouble finding [a job]."

### 5. Plans for J.T.V.H.

Mother stated at trial that her short-term goal for J.T.V.H. was "[t]o get day care" for him and her long-term goal for him was "just to try to make the best life for him possible . . . and just ensure that he's taken care of and happy, and in sports." She admitted that she had to rely on others for transportation and that she did not know how she would pay for day care for J.T.V.H., although she stated, "I heard CPS helps with that." Mother admitted that she had not looked into whether CPS could help her with day care and that she had not visited any nearby day cares, choosing to "wait to see if [she] got him first."[12] Mother's plan to care for J.T.V.H. was to get a job and to live with her parents while they supported her until she could get a car.[13]

Mother admitted that her plan for J.T.V.H. up until the week before trial had been for him to move into the Salvation Army with her. Before leaving the

---

[12]When asked by DFPS's counsel whether she understood that without a pending case, CPS could not provide her with day care or any services, Mother replied, "That's strange, I heard otherwise, but that's fine, if that's what you're telling me. I understand that."

[13]In Fry's July 2010 visit to Mother at the Salvation Army, when Fry asked Mother about her long-term and short-term plans, Mother's answer was "housing and employment," but with no specifics.

Salvation Army, she got on its "Shelter Plus" program list but said that it would have taken another four months to get an apartment. Mother's new plan was to move to Iowa with her family as soon as the house in The Colony sold and to put J.T.V.H. in private preschool there, with J.V.H. paying for everything. J.V.H. acknowledged that she and M.V.H. were supporting Mother because she did not have a job and that Mother had not had a steady job since January 2009, but she stated, "[I]f she's going to move with me, then she has to pay her way."

At the time of the trial, J.V.H. was living with her mother in Iowa while working as director of Faith Formations for St. Cecilia Church; M.V.H. remained with the house in The Colony. J.V.H. said they did not have a date yet for M.V.H. to move to Iowa because they were waiting for the outcome of the trial and hoped to move "as soon as we get [J.T.V.H.] back." J.V.H.'s plan was for J.V.H., M.V.H., Mother, and J.T.V.H. to live in Iowa, where they would enroll J.T.V.H. in a preschool that belonged to St. Cecilia. J.V.H. said that because she worked for the church, she would pay the minimal cost for the school.

Besides school, J.V.H.'s plan for J.T.V.H. was for him to be involved in the "same things the kids did," such as sports, scouting, and family vacations. J.V.H. said that J.T.V.H. needed Mother and his grandparents, that she had a large, closely-knit extended family in Iowa, and that she, Mother, and M.V.H. were committed to J.T.V.H. and to giving him a better life than what he had had up until this point.

Reynolds stated that she felt it was appropriate for J.T.V.H. to remain with his foster family, who wants to adopt him, and that this would be in J.T.V.H.'s best interest. Mother said that she felt like she and her family were ready to step up and take care of J.T.V.H. again.

## 6. Recommendations

DFPS agreed to extend Mother's case beyond the twelve-month deadline because in May 2010, Mother had completed some services and was making progress on others, but Williams said that there had been no change since the time the extension was granted—"[t]he only difference is now she lives in The Colony, which she moved back [to] a week ago yesterday," despite Mother's continued assertions during the case that she could not go back to The Colony because all of her drug-using friends lived there. Williams said that, based on what Mother had told her throughout the case, this was a bad choice.

Williams said that DFPS was seeking termination of Mother's parental rights in J.T.V.H.'s best interest "[b]ecause [J.T.V.H.] is in a stable, loving environment, and he's there with his half-sister, who he had a bond with. He's also been there for over a year, and he does have attachments to the caregivers, as well, and at this point, that is something that he definitely needs." In contrast, Mother is not stable and if J.T.V.H. were sent home with Mother, this would create a risk for him because there is no one there to monitor Mother. Because of Mother's history of conflict with M.V.H., she and J.T.V.H. could end up

homeless. Williams said that J.T.V.H.'s foster parents are willing to adopt him, and she believed that this was in J.T.V.H.'s best interest.

Reynolds testified that she spent around ninety-nine hours—significantly greater than the minimum requirement of fifteen—on the case before Fry took over so Reynolds could go on maternity leave. She met with Mother around three times a month, spoke with her about the resources available to her, and encouraged her. CASA's position at trial, based on observations, visits, and contact with Mother's service providers, was that Mother's parental rights to J.T.V.H. should be terminated. Reynolds explained this recommendation, stating

> [Mother], for the duration of this case, has been at the Salvation Army and has not made any attempts to find permanent safe housing for herself and for her child. She has made no attempts to find a career that will provide a full-time career with a good-paying salary that she can support herself and her child. [And] . . . [J.T.V.H.] is placed in a loving home and is cared for and is with a half-sibling right now.

Fry spoke with Boyles, who told her that Mother had no home and no job but that "we should help her find one." Fry said that she believed Mother had a lot of resources available to her—through CASA, CPS, and the Salvation Army—to do what Boyles suggested. Fry stated that CASA's position was for termination of Mother's parental rights because of Mother's lack of stability, housing, and employment. In considering J.T.V.H.'s best interest, Fry said that CASA considered his short-term and long-term physical and emotional well-being and his caretakers' abilities to provide for his short-term and long-term needs. Fry said that reunifying J.T.V.H. with Mother would put J.T.V.H. at risk because

37

Mother lived with M.V.H., whom she had reported abusing her as a child. Like CPS, CASA was concerned that if M.V.H.'s and Mother's relationship were to deteriorate, Mother and J.T.V.H. would be homeless.

Fry testified that J.T.V.H. was "in a wonderful home" and that his current placement would not be a danger to him because his foster parents have the parenting abilities to meet all of his needs. Fry said that she did not feel that Mother had the parenting abilities to meet all of J.T.V.H.'s needs at this time. She thought that J.T.V.H.'s chances for permanency and stability were better with the foster parents, where his half-sister also lives and with whom he has a bond and connection. Fry stated that termination of Mother's parental rights was in J.T.V.H.'s best interest because, "after a year of job training, housing, meals prepared, transportation, counseling, all of those resources available to [Mother], she still lacks employment and housing and hasn't been able to demonstrate the ability to care for herself or J.T.V.H."[14]

Boyles stated that she did not think that it was in J.T.V.H.'s best interest to terminate Mother's parental rights. J.V.H. testified that it was "absolutely not" in J.T.V.H.'s best interest for Mother's rights to him to be terminated, and Brauderick and McKinney said the same.

---

[14]Fry also said that she did not believe that J.T.V.H. was bonded with Mother, but she never requested a bonding assessment.

## C. Analysis

Mother complains that DFPS "wholly failed to present any competent evidence of the facts" to support the best interest finding, that conclusory statements will not support the finding, and that the evidence is undisputed that she was drug-free for the year preceding the trial, and she argues that the fact that she lived at the Salvation Army and failed to find gainful employment is not sufficient to support the best interest determination.

DFPS responds that the evidence is sufficient because Mother demonstrated a complete lack of stability in housing and employment, admitted that if J.T.V.H. were returned to her, she would move in with M.V.H., who had abused her as a child, and admitted that she would be totally dependent on M.V.H. and J.V.H. Further, Mother's psychologist and the Salvation Army representative both testified that Mother should not have custody of J.T.V.H., and DFPS and CASA witnesses testified that termination was in J.T.V.H.'s best interest.

Evidence of a parent's unstable lifestyle can support a factfinder's conclusion that termination is in a child's best interest, and "[a] parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child." *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.).

The trial court ordered Mother to complete the CPS service plan, and, for the most part, Mother complied. Neither party disputes that during the year and

a half that her case was open, Mother stayed drug-free for a year. *Cf. id.* Neither do they dispute that, although Mother eventually underwent her psychological evaluation, attended weekly counseling sessions, completed her parenting classes, underwent a drug and alcohol assessment, took regular random drug tests, and attended visits with J.T.V.H., she failed to establish and maintain safe, stable, and appropriate housing and suitable employment for at least six months and failed to pay child support every month.[15] *See id.*

Based on the testimony by Mother and J.V.H., the jury could have concluded that Mother and M.V.H. would be a volatile combination to expose three-year-old J.T.V.H. to, particularly with regard to physical abuse. Further, Mother and J.V.H. had different impressions of what J.V.H. would pay for, assuming Mother followed through with moving to Iowa, although both agreed that Mother needed a job to support J.T.V.H. As presented by their testimonies, the lack of stability regarding Mother's plans for J.T.V.H. and her parenting abilities, Mother's inability to establish and maintain suitable housing and employment before trial, and J.V.H.'s inability to supervise M.V.H. and Mother from a distance was sufficient for the jury to reasonably form a firm belief or conviction that it was in J.T.V.H.'s best interest to terminate Mother's parental rights. *See J.P.B.*, 180 S.W.3d at 573; *see also In re J.O.A.*, 283 S.W.3d 336,

---

[15]According to Fry, Mother made two $50 payments and "then a couple of times she had paychecks, and it was $5.77 and $10-and-something," which was insufficient for compliance.

40

346 (Tex. 2009) (stating that recent, short-term improvements do not conclusively negate the probative value of a long history of drug use and irresponsible choices). Further, because prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interests, *see* Tex. Fam. Code Ann. § 263.307(a), the conclusions and credibility determinations that the jury could have made from Mother's and J.V.H.'s testimonies were reinforced by the testimonies of CASA workers Reynolds and Fry, CPS caseworker Williams, and Mother's various other caseworkers and counselors, as well as her MHMR, Salvation Army, counseling, and psychological evaluation records. *See J.O.A.*, 283 S.W.3d at 346; *J.P.B.*, 180 S.W.3d at 573. We conclude that the evidence is legally sufficient to support the best interest finding, and we overrule Mother's second issue.

## IV. Rule of Evidence 605

In her first issue, Mother argues that the trial court violated evidence rule 605 when it allowed the State to elicit testimony regarding the trial court's termination of Father's parental rights. Specifically, she complains that admitting evidence that Father's parental rights had been terminated prior to trial "constitute[d] a judicial comment on the facts of the case before the jury" and created a presumption that shifted the burden of proof to Mother.

Mother admits that she did not object at the time the complained-of testimony was elicited, but she points out that rule 605 states that no objection is necessary to preserve the point. *See* Tex. R. Evid. 605. In response, the State

41

points out that the rest of the rule states that the "judge presiding at the trial *may not testify in that trial as a witness*," and that the complained-of testimony was not by the trial judge; rather, it was Mother's. *See id*. (emphasis added).

The complained-of testimony occurred after Mother stated that Father, to her knowledge, had never answered or appeared in the termination suit and that he had never paid any child support for J.T.V.H. She stated that for a couple of months after J.T.V.H. was born, she played "stay-at-home mom" while Father worked, but it did not work out between them because he partied on the weekends and was hardly ever home. DFPS's counsel then asked Mother whether the trial court terminated Father's rights prior to trial beginning, and Mother said that she did not know. DFPS's counsel reminded Mother that on the day before, the CPS caseworker had testified to the trial court about Father's lack of participation in his service plan and his failure to appear. Mother then agreed that the trial court had granted termination of Father's parental rights to J.T.V.H. The trial court said nothing during the entire conversation.

Mother argues that "it is clearly inferential that the jurors considered the Judge's actions in the father[']s termination as a judicial comment on the evidence against [her] in making their verdict." Mother relies on *In re M.S.*, 115 S.W.3d 534, 537–38 (Tex. 2003), and *Joachim v. Chambers*, 815 S.W.2d 234,

239 (Tex. 1991) (orig. proceeding),[16] to support her argument that *her* testimony constituted a specific finding by the trial court "as to the fitness of the father."

In *M.S.*, the trial court admitted its temporary orders into evidence. 115 S.W.3d at 536–37. The supreme court held that while admitting the orders as evidence to support DFPS's position that the parent had failed to comply with court orders was not in itself inappropriate, the trial court's factual findings in the orders should have been redacted so that the jury could draw its own conclusions about the parent's compliance. *Id.* at 538. It held that the error was harmless because the parent had the burden to show that she had been prejudiced by the orders' admittance and there was nothing in the record showing that DFPS specifically based any of its arguments on the findings or that DFPS even pointed out the findings to the jury, and the record contained ample other evidence that the parent did not comply with the trial court's orders. *Id.* at 538–39.

Assuming without deciding that Mother properly preserved this argument,[17] we hold that the trial court did not err when, as pointed out by the State, *Mother* testified that Father's rights had been terminated. It is not clear to us how

[16]*Joachim*, which involved the issue of whether a retired district judge who continued to serve as a judicial officer by assignment could testify as an expert witness in a particular case, is inapposite. 815 S.W.2d at 235, 240 (stating that under the relevant canon of judicial conduct, the retired district judge could not testify as an expert in the particular case at issue).

[17]Mother did not raise this argument in her statement of points but argues that the statute requiring the statement of points is void.

*Mother*'s testimony could fall under rule 605, even by implication, or how this would shift the burden of proof to Mother, but like in *M.S.*, there is nothing in the record showing that DFPS specifically based any of its arguments to terminate Mother's rights on the fact that Father's rights had been terminated before trial or that DFPS pointed out the finding to the jury in its closing argument, and—as set out in extensive detail above—the record contained ample other evidence to support termination of Mother's parental rights without any consideration of Father at all. *See id*. Therefore, we overrule Mother's first issue.

## V. Conclusion

Having overruled both of Mother's issues, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, DAUPHINOT, and GARDNER, JJ.

DELIVERED:  October 13, 2011